IN THE IOWA DISTRICT COURT FOR LINN COUNTY

| | |
|---|---|
| JENNIFER MCDOWELL, <br><br> Plaintiff, <br><br> vs. <br><br> MERCY HOSPITAL, CEDAR RAPIDS, IOWA d/b/a MERCY, NANCY HILL-DAVIS, and MARY BROBST, in their individual and corporate capacities, <br><br> Defendants. | Case No: <br><br><br> **PETITION AT LAW AND JURY DEMAND** |

**COMES NOW** the Plaintiff, Jennifer McDowell, by and through her attorneys, Newkirk Zwagerman, P.L.C. and for her cause of action states as follows

## INTRODUCTION

1. This is an action under the Iowa Civil Rights Act, Chapter 216 against Mercy Hospital, Cedar Rapids, Iowa (hereinafter "Mercy") for gender discrimination/harassment, unequal pay, and retaliation.

2. Defendants Nancy Hill-Davis and Mary Brobst fired Jennifer McDowell from her position as Director of Radiology, and their decision to fire Jennifer was motivated, in part, by gender and Jennifer's prior complaints about discrimination and unequal pay.

## PARTIES

3. Plaintiff, Jennifer McDowell, is a resident and citizen of Arizona who was employed by Mercy at all relevant times.

4. Defendant Mercy is an Iowa nonprofit corporation with its principal office in Cedar Rapids, Iowa.

1

5. Defendants Nancy-Hill Davis and Mary Brobst are believed to be residents of Cedar Rapids, Iowa.

## VENUE

6. The acts of which Plaintiff complains occurred at Mercy in Cedar Rapids, Linn County, Iowa.
7. These claims are not subject to removal and this Court has jurisdiction over these Iowa Civil Rights Act state law claims pursuant to 28 U.S.C. 1441(b)(2).

## PROCEDURAL REQUIREMENT

8. On September 4, 2018, within 300 days of the acts of which she complains, Plaintiff filed charges of employment discrimination for all her claims against the Defendant with the Iowa Civil Rights Commission.

9. Within 90 days of filing this lawsuit, Plaintiff obtained a Right to Sue letter for all her claims from the Iowa Civil Rights Commission.

## FACTUAL BACKGROUND

10. Jennifer applied and interviewed for a Director of Radiology position at Mercy in October of 2016.

11. Mercy had an extensive interview process to vet candidates for the director position. The outgoing male Director of Radiology participated in Jennifer's interview process.

12. During the interview process, Jennifer was asked several gender-based questions by her male predecessor.

13. Jennifer was asked whether she had children and how many children she had. She was also asked whether her husband would be moving with her if she was offered the job.

2

14. Asking a woman whether she has children during a job interview is a gender-based question. Men who seek jobs, and in particular, director-level jobs are not asked about their reproductive capacities and reproductive history.

15. Asking a woman whether her husband will be moving with her if she is offered a job assumes a woman with kids should be married. This is a gender-based comment.

16. Assuming that a woman with kids should be married to a man is a gender-based assumption rooted in heteronormative assumptions of who should raise children.

17. Jennifer is a successful, professional, working single mother of two beautiful children.

18. When her male predecessor learned Jennifer is a single mother, he pointed to a picture of his wife and children and said he would not have been able to do the job without the support of his wife. In that same context, he told Jennifer that he was worried about her capacity to do the job.

19. Other interviewers noted concerns about Jennifer's capacity to do the job, so Jennifer reported the gender-based comments to the Senior Vice President and Chief Nursing Officer Mary Brobst.

20. Jennifer does not need to be married to a man or any person for her to do any job.

21. Jennifer was hired for the Director of Radiology position in October 2016.

22. Jennifer's immediate supervisor was Senior Vice President Mary Brobst.

23. Jennifer was qualified to do her job and she performed her job well.

24. SVP Brobst gave Jennifer a positive first year evaluation on June 23, 2017.

25. SVP Brobst admitted that Jennifer brought "a well-developed, experienced leadership style to [Mercy's] Radiology Department."

26. Brobst also admitted that Jennifer "is fair, just and pragmatic with are great and needed qualities for Jennifer to bring to a department."

27. Brobst further admitted that Jennifer was "quickly learning how to lead in a physician-lead, professionally managed culture."

28. Jennifer continued to experience gender-based treatment from male doctors at Mercy that was not addressed after she reported it.

29. At the end of 2017 and into the beginning of 2018, Jennifer worked with a team to develop a new initiative regarding IVs.

30. The IV initiative had the full support by the Board of Directors and upper management.

31. On November 17, 2017, Jennifer, SVP Brobst, and the Chief Nurse Anesthetist (all women) held a meeting with Dr. Walsh, a male doctor. When Jennifer suggested that Dr. Walsh attend a training session regarding the IV initiative at the University of Iowa, he responded by throwing an adult tantrum. He rolled his eyes, scoffed, pushed away from the table, turned his back on Jennifer in the meeting, and referred to her condescendingly as *Mizz* McDowell.

32. After the meeting, Jennifer told SVP Brobst that she felt Dr. Walsh's aggressive, resistant reaction to her and the IV initiative was because of her gender.

33. Mercy did not investigate this complaint of gender discrimination and harassment.

34. Instead of supporting Jennifer in the IV initiative, Jennifer was chastised for upsetting Dr. Walsh and she was told that not everyone thinks the University of Iowa is the standard of care.

35. Mercy scrapped the IV initiative after Jennifer's complaint of gender discrimination against Dr. Walsh.

36. Mercy permitted another male doctor to undermine, disrespect, and demean Jennifer based on her gender.

37. Jennifer became aware of a potential health risk of employees being exposed to radiation in her department, so she implemented protocol to eliminate the risk in February 2018.

38. One of Mercy's male doctors did not like the new protocol and the change.

39. Instead of communicating professionally to voice his concerns, Defendant Dr. Cam Campbell called Jennifer on the phone on February 12, 2018 and berated her about the protocol. He asked her how incompetent she was because she had three directors in her department doing the same work that one man used to do.

40. Dr. Campbell's assumption that Jennifer's reorganization of her department was done because she couldn't do the job like her male predecessor is a gender-based accusation.

41. Jennifer recorded some of this conversation on her work phone and reported the comment and the yelling to her supervisor SVP Brobst and to the Vice President of Human Resources, Nancy Hill-Davis.

42. Ms. McDowell asked to file a formal complaint against Dr. Campbell and offered her February phone recording as evidence.

43. Instead of practicing Mercy's policy to investigate the discrimination complaint, Jennifer's recording of Dr. Campbell's harassment was erased from her work phone without her permission and without explanation.

44. Jennifer was surprised her discrimination complaint was not investigated because she had witnessed Dr. Campbell harass other female employees, some of which had complained about his behaviors.

45. In May of 2018, Ms. McDowell learned she was paid significantly less than her male predecessor.

46. In contrast to her male predecessor's doubts about her capacity to do his job, Jennifer was assigned even more responsibilities than her male predecessor. In addition to her duties as Director of Radiology, Jennifer oversaw the building of a new facility, coordinated two organizational redevelopments, and managed five departments.

47. Her male predecessor only managed four departments.

48. Jennifer assumed she was as given greater responsibilities because she had a Master's degree and her male predecessor only had a Bachelor's degree. She was also a six sigma certified black belt and her male predecessor was not. She also had assumed she was given more responsibilities than her male predecessor because of her good job performance at Mercy.

49. Even though Jennifer performed more duties than her male predecessor and had more education, she was paid approximately $30.00 an hour less than he was paid. He was paid approximately $62,000.00 more than Jennifer annually.

50. When Jennifer asked whether she had the same job description as her male predecessor, SVP Brobst told her the only thing that had been changed was the job title but that the job description had stayed the same.

51. Mercy makes subjective, discretionary decisions to set pay for employees, including director level positions.

52. Mercy does not consistently pay employees based on seniority, merit, or quantity or quality of production.

53. When Jennifer asked SVP Brobst about the pay disparity, SVP Brobst acknowledged the disparity and offered two explanations for the pay discrepancy: 1) different job titles and 2) seniority. Neither of these rationales are consistent with Mercy's policies or practices.

54. After Jennifer complained of gender discrimination, harassment and unequal pay based on her gender, Mercy had to search for ways to terminate Jennifer because her performance was very good.

55. On June 21, 2018, SVP Brobst gave Jennifer a 360° review. The evaluation was positive and included comments like:

   a. "approachable and takes time to listen to what you have to say"
   b. "made many improvements to the department"
   c. "She uses her position to help resolve any issue before they become bigger problems"
   d. "makes it easier to do our jobs"
   e. "excellent content and departmental knowledge".

56. In July 2018, an anonymous hotline complaint was made against Jennifer.

57. Unlike Mercy's responses to Jennifer's protected complaints, and unlike Mercy's responses to complaints made about male emploiyees, Mercy decided to investigate the anonymous complaint.

58. Jennifer was placed on a one-week unpaid administrative leave during the investigation.

59. Jennifer had no disciplinary actions in her file.

60. Mercy follows progressive disciplinary action called the error accountability matrix.

61. Mercy investigated the complaint with rigor and asked employees gender-based questions regarding Jennifer including questions about her sexuality.

62. The investigation was a fishing expedition to find reasons to fire Jennifer.

63. During the investigation, Jennifer asked what the status was on her complaints of discrimination. She was told that her complaints had been resolved even though they had not been addressed.

64. On August 17, 2018, Brobst and Hill-Davis fired Jennifer for conduct of which she had never been warned or reprimanded.

65. The reasons for terminating Jennifer are pretext for discrimination.

66. Jennifer's termination is a result of Mercy's pattern and practice of terminating women in high level positions who complain of discrimination.

67. In contrast, when Jennifer wanted to fire a male employee that sexually harassed other employees, she was made to follow the progressive discipline policy by human resources before she could fire him. It took eight months to fire the male sexual harasser.

## COUNT I

### VIOLATIONS OF THE IOWA CIVIL RIGHTS ACT
### GENDER DISCRIMINATION, HARASSMENT, UNEQUAL PAY, AND RETALIATION

68. Plaintiff re-alleges all prior paragraphs as if fully set forth herein.

69. Under the provisions of Iowa Code Chapter 216, it is unlawful for an employer to discriminate, harass or retaliate against an employee for engaging in activity protected by Chapter 216.

70. Under the provisions of Iowa Code Chapter 216, it is unlawful to pay women less than men for performing the same job when the pay decision was not based on a seniority system, merit system, or system which measures quantity or quality of production or any factor other than sex.

71. Jennifer was discriminated against, harassed, and paid unequally to her male predecessor by Defendants.

72. The decision to pay Jennifer less than her male predecessor who performed less duties than Jennifer violated the Iowa Civil Rights Act.

73. The decision to pay Jennifer less than her male predecessor was a willful violation of the Iowa Civil Rights Act.

74. When Jennifer reported gender discrimination and harassment, her complaints were not investigated and was she was retaliated against.

75. Jennifer's gender was a motivating factor in Defendants decisions regarding the terms and conditions of her employment.

76. As proximate result of Defendants' actions, as outlined above, Plaintiff is in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

**WHEREFORE**, Plaintiff prays that the Court find that the Defendant unlawfully harassed and discriminated against her based on gender, paid her unequally to her male predecessor, that the decision to pay her less than a man was willful, that she was terminated and retaliated against and; that the Court order Defendants to pay Plaintiff all past and future wages and lost benefits, including interest, that the Court order Defendants to pay Plaintiff appropriate damages for emotional distress in an amount to be proved at trial; that the Court order

Defendants to pay all costs and attorneys' fees incurred by Plaintiff in pursuing this action, for equitable relief, including but not limited to Court ordered Gender Bias Training, and for such other relief as may be just in the circumstances and consistent with the purpose of the Iowa Civil Rights Act.

Respectfully Submitted,

NEWKIRK ZWAGERMAN, P.L.C.

*/s/ Beatriz Mate-Kodjo*
Leonard E. Bates   AT0010869
lbates@newkirklaw.com
Beatriz Mate-Kodjo AT0012331
Bmate-kodjo@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
ATTORNEYS FOR PLAINTIFF